**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| DANIEL MAX ROMANO, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | |
| | § | CIVIL ACTION NO. 4:25-cv-1548 |
| MATAGORDA COUNTY, TEXAS; | § | |
| CALEB ROBLES, BRYAN RESENDEZ, | § | |
| LEE LONGORIA, JERRY JOHNSON, | § | |
| JOHN GARZA and DANIELLE | § | |
| GALAVAN, | | |
| | | |
| *Defendants*. | | |

**PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND**

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Plaintiff **DANIEL MAX ROMANO** (hereinafter referred to as "Plaintiff"), and files this Original Complaint against Defendants **MATAGORDA COUNTY** (hereinafter referred to as "Defendant County" or the "County"), **CALEB ROBLES**, **BRYAN RESENDEZ**, **LEE LONGORIA**, **JERRY JOHNSON**, **JOHN GARZA, DANIELLE GALAVAN** (hereinafter collectively referred to as the "Defendant Officers"). In support of such, Plaintiff would show the Court as follows:

## I.    STATEMENT OF THE CASE

1.    This is an action for damages brought under 42 U.S.C. § 1983 against Defendants. Defendant County's pattern-or-practice is to, use excessive force on a pre-trial detainee who was nearly beaten to death inside a jail cell by several law enforcement agents, while still in handcuffs and intoxicated, and to thereafter deny him the necessary medical care for serious medical needs.

1

2.     The causes of action against the municipal and individual defendants are as follows. The *First Count* stated in this pleading is for excessive force or police abuse which arises when a plaintiff suffers injuries from excessive force during an investigation or arrest, infringing on his Fourth Amendment right against unreasonable seizures. The *Second Count* is for bystander liability arising out of a state actor's failure to intervene to stop and report a violation of a citizen's constitutional rights, when it was clear the individual's constitutional rights were being violated and the state actor had a reasonable opportunity to prevent the harm being inflicted but chose not to act. The *Third Count* is for failure to provide medical care, or to deny or delay such medical care, when a state actor should have provided that care, after the actor was aware of it and knew there was a substantial risk of serious harm. The *Fourth Count* stated in this pleading is for municipal liability against Matagorda County under a *Monell* cause of action, for adopting an official policy or custom inside the county jail, and having knowledge of that policy or custom, which is the moving force that produces the constitutional violation of the Plaintiff. The *Fifth Count* is also for municipal liability for failure to train its officers and staff inside the county jail showing deliberate indifference to the Plaintiff's constitutional rights. *Count Six* of this complaint is against Matagorda County for failure to supervise its officers inside the county jail, reason for which Plaintiff's constitutional rights were violated, recklessly disregarding his rights.

3.     In this pleading, the Plaintiff also asserts that the individual officers being sued do not –and should not— enjoy the limited, qualified immunity granted to state actors who follow the law and abide by the U.S. Constitution. The officers sued herein all acted knowing they were violating clearly established constitutional rights, and recklessly disregarded these rights, causing injury to the Plaintiff.

4.      As a result of his constitutional violations, Plaintiff asserts herein that he has suffered compensatory, special, and punitive damages for physical impairment and disfigurement; extreme mental anguish and emotional distress; lost wages and loss of earnings capacity; loss of enjoyment of life; pain and suffering; violations of his constitutional rights by Defendants; and reasonable and necessary attorneys' fees incurred, which are compensable under 42 U.S.C. § 1988. Plaintiff also seeks imposition of punitive damages against the individual officers named as defendants (but not the county).

## II.    JURISDICTION AND VENUE

5.      This action is brought pursuant to 42 U.S.C. §1983 and §1988 and the Fourth Amendment to the United States Constitution, made applicable to the Defendants through the Fourteenth Amendment to the United States Constitution.

6.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, 42 U.S.C. § 1983, and 42 U.S.C. § 1988.  Additionally, the Honorable Court has supplemental jurisdiction over the Plaintiff's state law claims, if any such claims arise from the facts stated in this pleading. 28 U.S.C. § 1367.

7.      Venue is proper in this Court pursuant to § 1391(b) because the incident in question, particularly the false arrest giving rise to this action, took place in Matagorda County, Texas, within the Southern District of Texas.

## III.    PARTIES

8.      Plaintiff **DANIEL MAX ROMANO** is a resident of Texas.

9.      Defendant **MATAGORDA COUNTY** is a county in the state of Texas.  The county may be served with process by and through its County Attorney Matthew Hardy Sloan at 1700 7th Street Room 305, Bay City, TX 77414.

10.     Defendant **CALEB ROBLES** is being sued in his official and individual capacity. At all times relevant, he was an employee of the Matagorda County's Sheriff's Office, was a willing participant in the violent violation of Plaintiff's constitutional rights and his hand was injured in the process, and he can be served with process at this place of employment located at 2308 Avenue F, Bay City, TX 77414.

11.     Defendant **BRYAN RESENDEZ** is being sued in his official and individual capacity.  At all times relevant, he was an employee of the Matagorda County's Sheriff's Office, was a willing participant in the violent violation of Plaintiff's constitutional rights, and can be served with process at this place of employment located at 2308 Avenue F, Bay City, TX 77414.

12.     Defendant **LEE LONGORIA** is being sued in her official and individual capacity. At all times relevant, Sergeant Longoria was an employee of the Matagorda County's Sheriff's Office, she was the supervisor at the county jail at the time when the incidents took place, was present in the room when the Plaintiff's constitutional rights were violently violated, and can be served with process at this place of employment located at 2308 Avenue F Bay City, TX 77414.

13.     Defendant **JERRY JOHNSON** is being sued in his official and individual capacity.  At all times relevant, he was an employee of the Matagorda County's Sheriff's Office, and can be served with process at this place of employment located at 2308 Avenue F Bay City, TX 77414.

14.     Defendant **JOHN GARZA** is being sued in his official and individual capacity.  At all times relevant, he was an employee of the Matagorda County's Sheriff's Office, and can be served with process at this place of employment located at 2308 Avenue F Bay City, TX 77414.

15.     Defendant **DANIELLE GALAVAN** is being sued in his official and individual capacity.  At all times relevant, she was an employee of the Matagorda County's Sheriff's Office,

4

and can be served with process at this place of employment located at 2308 Avenue F Bay City, TX 77414.

## IV.   RELEVANT BACKGROUND

### A.   THE INCIDENT MADE THE BASIS OF THIS LAWSUIT

16.   On the night of April 13, 2023, the Plaintiff was transported to the Matagorda County jail and while he was being formally booked inside the jail he was brutally beaten by jail staff to the point where Plaintiff suffered a serious traumatic brain injury, which required transporting him by helicopter to the Texas Medical Center from Matagorda County.

17.   That night began with Plaintiff's arrest after he was driving on the road in Matagorda County. A police officer named Christian Wied employed by the City of Palacios, located in Matagorda County, Texas, stopped and arrested the Plaintiff for reckless driving on a public road, a Class B misdemeanor, and then delivered him to the Matagorda County Jail in his patrol vehicle. Said police officer arrived at the jail and parked his patrol vehicle in the sally port, near a rear-entry jail door.[1]   As he stopped and parked, a female officer opened the patrol vehicle door for the handcuffed Plaintiff, and asked the Plaintiff to step out.   Wearing a clean teal blue shirt, the Plaintiff complied with that request.   Thereafter, Defendants Caleb Robles, Bryan Resendez, and Rene Padilla approached the Plaintiff and escorted the Plaintiff from the sally port to inside the Matagorda County Jail.

18.   From the sally port, the Plaintiff calmly walked down the hallway of the jail, and then was made to turn left at the end of the hallway by the officers.   Defendants Caleb Robles,

---

[1] A "sally port" is "a secure entryway (as at a jail or prison) that consists of a series of doors or gates," per *Merriam-Webster* online dictionary. *See* Sally port Definition & Meaning - Merriam-Webster.

5

Bryan Resendez, and Rene Padilla then violently pushed the Plaintiff inside a padded room, while Defendant Lee Longoria watched from outside the door of the padded room.

19.     Defendants Caleb Robles, Bryan Resendez, and Rene Padilla then laid the fully clothed Plaintiff face down, took his shoes and socks off, removed the Plaintiff's handcuffs, and returned the handcuffs to City of Palacios Officer Christian Wied.  The Plaintiff, however, continued to be wearing his clean teal blue shirt.  And, upon information and belief, Plaintiff was re-hand cuffed with Matagorda County handcuffs.

20.     "Let's beat him up," Defendants Caleb Robles, Bryan Resendez, and Rene Padilla said as the Plaintiff laid face down.  "Don't beat me up," the Plaintiff yelled back, begging.  As it turned out, at the time, City of Palacios Officer Christian Wied was standing in the nearby hallway with his body camera recording, and these statements can be heard on it before it cuts stops recording.  The video, unfortunately, ends before the Defendants can be observed giving Plaintiff the beating they had promised.

21.     Upon information and belief, Defendants Caleb Robles and Bryan Resendez abruptly and without provocation violently and unnecessarily threw the  Plaintiff against the wall. While Romano stood helpless and complied with their requests, Defendants Caleb Robles, Bryan Resendez, and Rene Padilla viciously beat him while Defendant Lee Longoria watched.  So vicious and violent was the beating that Defendant Caleb Robles broke his hand from his punches.

22.      After the Plaintiff fell to the ground, Defendants Caleb Robles, Bryan Resendez, and Rene Padilla continued to viciously beat him.  Defendants Caleb Robles, Bryan Resendez, and Rene Padilla seemingly kicked the helpless Plaintiff in the side of the head repeatedly. This continued for over two (2) minutes, and at no point, did the Plaintiff resist.  During the assault, Plaintiff was unable to protect his cranium or brain from injury because he was hand-cuffed and

naked, and during the hazing he begged them to stop, and yelled for help and kept telling the assaulting officers would be killed if they continued. They all heard him. None of them did anything to stop the excessive and abusive bodily assault.

23. During this time also, Defendant Lee Longoria watched and stood by from a distance at which she could intervene and stop the vicious beating. Instead of ordering it to stop or attempting to physically stopping it herself, she instead acquiesced, stood by and laughed as her subordinates continued to viciously beat the Plaintiff in front of her.

24. After it, the Plaintiff begged for medical attention his serious physical injuries. But, instead of immediately providing it, Defendants Caleb Robles, Bryan Resendez, Rene Padilla, and Lee Longoria striped the Plaintiff of his bloody blue teal shirt. During which, the bloodied Plaintiff kept begging for medical attention. Instead of seeking it or providing it, Defendants Caleb Robles, Bryan Resendez, Rene Padilla, and Lee Longoria instead violently threw the Plaintiff into a urine covered floor and declined to even bother to check in on him for one (1) full hour.

25. During this time, Defendant Matagorda County had ten (10) employees on duty, and not one of them came to the Defendant's aid during the first hour after the attack. Defendants Caleb Robles, Bryan Resendez, Rene Padilla, and Lee Longoria were also careful to also note record or log the incident until much later.

26. After one (1) full hour following the assault on the Plaintiff, Defendant Deputy Jerry Johnson finally came by to check in on the Plaintiff. As the Plaintiff laid naked on the urine-soaked floor, he kept calling out for help and begged for medical attention for his serious head injuries, because the headache he had was extremely painful and acute, due to the bleeding he had inside his cranium. Deputy Jerry Johnson as well as all others totally ignored the pleas from the blood-soaked Plaintiff.

27.     Defendant Jerry Johnson was not alone in totally ignoring the blood-soak Plaintiff as he screamed in complete agony.  Defendant Deputies John Garza and Danielle Galvan took walked by the Plaintiff's cell and were deliberately indifferent to the blood-soaked Plaintiff's requests for medical attention for his serious physical and internal injuries.

28.     During this time, the Plaintiff's head felt as if it was going to explode.  Although the Plaintiff was clearly in agonizing pain, Defendant Deputies John Garza and Danielle Galvan ignored him as they passed by his cell. Plaintiff was not provided any medical treatment. After more than twelve (12) long and agonizing hours, the next day, Plaintiff was eventually released from the Matagorda County jail.  During his release, the Defendants gave the Plaintiff back his bloodied teal blue shirt and other belongs.

29.     Plaintiff's brother picked him up from the jail. The brother, observing that his brother had blood and clear signs of a concussion and in in obvious need of medical attention, immediately took the Plaintiff to a regional hospital a few miles down the road, in Bay City, Texas. There, the doctors at the regional hospital found that Plaintiff's brain was internally bleeding to the point that it was dangerously close to killing him.  Plaintiff had suffered a massive brain injury, was at risk of dying, and would need to have more specialized medical attention.

30.     Thus, the doctors at the regional hospital decided to request emergency air transportation, and Plaintiff was thereafter taken in a helicopter to the Texas Medical Center, in Houston, Texas. Plaintiff was unconscious when he was being transported in helicopter to the Texas Medical Center, which was over 100 kilometers away, because he suffered a grand mal seizure prior to him being transported. Plaintiff spent numerous days in the hospital at the Texas Medical Center. He eventually had to have brain surgery to address the dangerous blood

accumulation inside his brain. And he continues to have medical attention and treatment nearly two years after these events inside the Matagorda County jail.

31.     As a result, to this day, Plaintiff has suffered greatly from the serious brain injury inflicted on him by the deputies inside the jail. He has suffered serious psychological injuries and deep mental anguish as a result of these events too. Mr. Romano's brain injuries were so severe that he still to this day suffers from Gran mal seizures, also known as tonic-clonic seizures, as well as other kinds of seizures, as a result of the acts and omissions of the named Defendants. His life, health and well-being has been forever affected by these events.

32.     The day Plaintiff's brother picked him up at the county jail, he complained to the jail staff, but they ignored his request for information about his brother's injuries. The Plaintiff's brother also spoke to the bail bond company that assisted in bailing Plaintiff out of jail, and an employee commented that she was not surprised her brother was beaten inside the jail because, according to her, there had been many violent incidents inside the jail at the hand of deputies.

33.     At no point after Plaintiff was assaulted and beaten inside the jail was he examined by a jail medical staff or medical personnel, at no point did any deputies approach him, inside his cell, to examine his serious head injuries or his condition, to determine whether any urgent medical treatment was necessary in order to aid him.

### B.     PRE-SUIT DISCOVERY EFFORTS

34.      On July 7, 2023, the Plaintiff made Public Information Requests to Defendant Matagorda County and the City of Palacios.  When those were successful, on August 22, 2023, the Plaintiff filed a Verified Tex. R. Civ. P. 202 Petition to Investigate Potential Claims in 130th Judicial District.  On January 3, 2024, the Honorable 130th Judicial District heard the matter, and

9

verbally granted the request. On February 14, 2024, the Honorable 130th Judicial District issued its written order granting the Tex. R. Civ. P. 202 request.

35.     Since then, Plaintiff has relentlessly pursued and fought Matagorda County to obtain as much evidence as possible, with some positive results. Matagorda County opposed the effort and some information was not allowed. Some records allegedly don't exist, some do. With the benefit of some pre-suit discovery, the Plaintiff now files this federal lawsuit.

## V.     CAUSES OF ACTION

### A. CAUSES OF ACTION AGAINST NAMED DEFENDANTS

#### COUNT 1 – EXCESSIVE FORCE
#### (Against Defendants Robles and Resendez)

36.     Plaintiff fully incorporates the foregoing and succeeding paragraphs as if set forth herein.

37.     Under Fifth Circuit precedent, "[w]hen a plaintiff alleges excessive force during an investigation or arrest, the federal right at issue is the Fourth Amendment right against unreasonable seizures." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014). Whether a police officer's use of force is excessive or unreasonable depends on "the facts and circumstances of each particular case." *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009). To prevail on an excessive force claim, a plaintiff must demonstrate the following three elements: (1) an injury (2) which resulted directly and only from the use of force that was clearly excessive to the need and (3) the force used was objectively unreasonable. *Cass v. City of Abilene*, 814 F.3d 721, 731 (5th Cir. 2016) (*quoting Goodson v. City of Corpus Christi*, 202 F.3d 730, 740 (5th Cir. 2000)) (internal quotation marks omitted); *Darden v. City of Fort Worth*, 800 F.3d 722, 727 (5th Cir.), cert denied, 139 S. Ct. 69 (2018).

38.    The injuries suffered by Plaintiff resulted directly and only from uses of force that was clearly excessive and was clearly unreasonable.  Here, it is questionable whether any use of force was justified.  *Larpenter v. Vera*, 2023 U.S. App. LEXIS 22770 *17 (5th Cir. 2023).  Force against a pretrial detainee is excessive and a violation of the Fourteenth Amendment when the force was objective unreasonable.  *Kingsley v. Hendrickson*, 576 U.S. 389, 396-397 (2015).  The following factors bear on the reasonableness inquiry: (a) the relationship between the need for the use of force and the amount of force used, (b) the extent of plaintiff's injury, (c) any effort made by the officer to temper or to limit the amount of force, (d) the severity of the security problem at issue, (e) the threat reasonably perceived by the officer, and (f) whether the plaintiff was actively resisting.  *Id.*, 397.

39.    In this case, Defendants Robles and Resendez, who were both employees of the Matagorda County's Sheriff's Office, working in the county jail, were willing participants in the violent attack against Plaintiff knowingly or intentionally violating Plaintiff's constitutional rights. They both knew that Plaintiff was handcuffed and intoxicated surrounded by armed police officers, and in these circumstances violently beat Plaintiff to the point where Plaintiff was left bloodied, on the floor, with a massive brain concussion.

40.    In fact, Defendant Robles not only kicked Plaintiff, but he also beat Plaintiff with his bare hands using such force that, when he struck Plaintiff in the head repeatedly, he himself was injured in the process, and had to seek medical aid with respect to his hand injury. Defendant Resendez used his hands and feet to both punch and kick Plaintiff, who was handcuffed, in multiple areas of his body, including his head and face, to the point of causing Plaintiff enormous amount of pain and suffering. The amount of force used by these Defendants against Plaintiff was excessive and unreasonable under the circumstances, given that Plaintiff had already been detained

11

for almost 2 hours, was already inside a holding cell inside the county jail and still in handcuffs (with hand bound, behind his back), was surrounded by more than one deputy officer, and was unarmed, weak and intoxicated, and therefore posed no significant threat to the deputies who were engaging with him at the time.

41.　　More importantly, Defendants Robles and Resendez expressly manifested their intent to beat the unarmed and subdued face down Plaintiff, and stated the same.　Nor did the Plaintiff pose a threat when Robles and Resendez abruptly and without provocation violently and unnecessarily threw the Plaintiff against the wall, and then to the blood and urine-soaked floor where Robles and Resendez further beat up the subdued Plaintiff.　Thirdly, Plaintiff was not actively resisting or attempting to evade, but rather complied with these officers' requests and demonstrated passively resistance at most by asking them to please not beat him up. Therefore, it is clear the abuse suffered by Plaintiff at the hand of the deputies here was clearly excessive force that was unreasonable under the circumstances.

## COUNT 2 – BYSTANDER LIABILITY / FAILURE TO INTERVENE
### (Against Defendant Longoria)

42.　　Plaintiff fully incorporates the foregoing and succeeding paragraphs as if set forth herein.

43.　　Under Fifth Circuit precedent, a police officer may be held liable under a bystander-liability theory pursuant to Section 1983. To prove bystander liability, a plaintiff must demonstrate that a defendant officer "(1) [knew] that a fellow officer [was] violating an individual's constitutional rights; (2) [had] a reasonable opportunity to prevent the harm; and (3) [chose] not to act." *Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013). Moreover, in order for bystander

liability to exist, there must be an underlying use of excessive force. *Id*.; *see also* <u>Hale v. Townley</u>, 45 F.3d 914, 919 (5th Cir. 1995) ("The district court correctly held that an officer who is present at the scene and does not take reasonable measures to protect a suspect from another officer's use of excessive force may be liable under section 1983").

44.     Defendant Longoria is liable to Plaintiff under bystander liability insofar she was a sergeant of higher rank inside the jail and the supervisor at the county jail at the time when the incidents took place, was physically present in the room and witnessed when Plaintiff was being physically assaulted and beaten down by Defendants Robles and Resendez, who were under her direct supervision, and she did nothing to stop them from violating Plaintiff's constitutional rights. Defendant Longoria also failed to report the violation of constitutional rights by Defendant Robles and Resendez to anyone, including law enforcement authorities or disciplinary bodies within the county.

45.     In other words, Defendant Longoria, the supervising sergeant that personally witnessed an event of excessive use of force directly in front of her and before her own eyes, did nothing. She had a reasonable opportunity to prevent the harm done against Plaintiff, and she knowingly or intentionally chose not to act to prevent it or stop it, once it began.

## COUNT 3 – MEDICAL CARE VIOLATIONS
### Failure to Provide Medical Care, or Deny or Delay It
**(Against Caleb Robles, Bryan Resendez, Lee Longoria, Jerry Johnson, John Garza and Danielle Galavan)**

46.     Plaintiff fully incorporates the foregoing and succeeding paragraphs as if set forth herein.

47.     To succeed on a deprivation of essential medical care claim, a plaintiff need only show that (1) the official was aware of facts from which the inference could be drawn that a

substantial risk of serious harm exists, and (2) the official actually drew that inference. *Austin v. City of Pasadena*, 74 F.4th 312, 328 (5th Cir. 2023) (reversing dismissal). Such may be established through inferences arising from circumstantial evidence, and a factfinder may infer the requisite knowledge from the fact that the risk of harm was obvious. *Farmer v. Brennan*, 511 U.S. 825, 842 (1994); *Austin v. City of Pasadena*, 74 F.4th 312, 328 (5th Cir. 2023) (finding the same); *Dyer v. Houston*, 964 F.3d 374, 385 (5th Cir. 2020) (finding that a reasonable juror could conclude an officer was deliberately indifferent where unjustifiable high risk to detainee's health was obvious)

48.   A prison guard is deliberately indifferent if he intentionally denies or delays access to medical care or intentionally treats the detainee incorrectly. *Estelle v. Gamble*, 429 U.S. 97, 104-105 (1976).  Moreover, an officer acts with deliberate indifference to a detainee's serious medical needs if the officer refuses to treat him, ignores his complaints, intentionally treats him incorrectly, or engages in any similar conduct that would clearly evince a wanton disregard for any serious medical needs. *Sims v. Griffin*, 35 F.4th 945, 951 (5th Cir. 2020) (affirming denial of qualified immunity).  That includes failing to promptly call for emergency assistance when a detainee faces a known, serious medical emergency. *Austin v. City of Pasadena*, 74 F.4th 312, 328 (5th Cir. 2023).  The detainee need not die, or be permanently impaired, before an actionable claim arises for delayed emergency treatment; rather, a plaintiff may recover for pain suffered during a delay in treatment caused by deliberate indifference. *Alderson v. Concordia Parish Corr. Facility*, 848 F.3d 415, 422-423 (5th Cir. 2017) (finding allegations sufficient to allege deliberate indifference in delaying medical treatment).

49.   In this case, Plaintiff was clearly deprived of essential medical care inside the Matagorda County jail after he was beaten nearly to death by deputy officers booking him. The officers inside the jail were well-aware of the incident because the beating took place by two

deputies, inside a cell, with the shift supervisor sergeant present, witnessing the incident in front of her. They viciously beat Plaintiff while Defendant Longoria watched.  The fact that Sargeant Longoria, the on-duty supervisor, watched and stood by without intervening or stopping the others under her supervision from nearly beating Plaintiff to death, is the clearest form of notice.  Plus, during the assault, Plaintiff repeatedly begged them to stop, and yelled for help and kept telling the assaulting officers would be killed if they continued. They all heard him. None of them did anything to stop it.

50.    All of the above shows that they had reasonable and sufficient notice of a substantial risk of serious harm.  *Austin v. City of Pasadena*, 74 F.4th 312, 328 (5th Cir. 2023) (reversing dismissal). Such may be established through inferences arising from circumstantial evidence, and a factfinder may infer the requisite knowledge from the fact that the risk of harm was obvious.  *Farmer v. Brennan*, 511 U.S. 825, 842 (1994); *Austin v. City of Pasadena*, 74 F.4th 312, 328 (5th Cir. 2023) (finding the same); *Dyer v. Houston*, 964 F.3d 374, 385 (5th Cir. 2020) (finding that a reasonable juror could conclude an officer was deliberately indifferent where unjustifiable high risk to detainee's health was obvious). The clear and reasonable inference is they had knowledge of the risk of substantial harm if medical treatment was denied or refused, and they did nothing.

51.    These prison guards were deliberately indifferent to Plaintiff's need for urgent medical attention.  They saw him bleeding on the floor. They saw him begging for help and requesting medical attention, and intentionally or knowingly ignored him. Whether it was done knowingly, recklessly or intentionally, the reality is they denied (or delayed) access to medical care.  *Estelle v. Gamble*, 429 U.S. 97, 104-105 (1976).  They completely ignored his specific

complaint for help, as he laid on the floor bleeding. This showed a wanton disregard for Plaintiff's serious medical needs.  *Sims v. Griffin*, 35 F.4th 945, 951 (5th Cir. 2020).

### COUNT 4 – MUNICIPAL LIABILITY / Pattern-or-Practice
### (Against Defendant County)

52.    Plaintiff fully incorporates the foregoing and succeeding paragraphs as if set forth herein.

53.    A municipality (including a city or state county) may be directly liable as a "policy maker" pursuant to the landmark case of *Monell v. Dep't of Soc. Servs*., 436 U.S. 658 (1978).  For such, Plaintiff need only show (1) the existence of an official policy or custom, (2) that a policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose moving force is that policy or custom.  *Moore v. LaSalle Management*, No. 20-30739 (5th Cir., July 22, 2022 *reh'g denied*)at Pg. 21 ¶ 2; *Bishop v. Arcuri*, 674 F.3d 456, 467 (5th Cir. 2012, *reh'g denied*); *Releford v. City of Houston*, No. 4:14-CV-2810 (S.D. Tex., Feb. 29, 2016) at Pg. 7 # B.

54.    Such elements can be established through the presentation of a "pattern of incidents." Generally speaking, a Plaintiff needs to show that a "pattern of incidents" has occurred in the municipality and that the amount of incidents is reasonably sufficient to establish a "pattern" that constitutes a policy or custom of constitutional violation. The number of incidents required to do so is considerably less in counties or cities with less population, when compared to larger cities or counties within a state.

55.    In this case, upon information and belief, Defendant County has only a population of approximately 36,000 residents and a meager 72 sworn deputy sheriffs or police officers, as

16

opposed to millions of civilians and thousands of officers that other large cities such as Houston, Dallas or Fort Worth have in the State of Texas. This is important.

56.     Under *Monell*'s first element, the pattern-or-practice of Defendant County includes tolerating, endorsing and/or being deliberately indifferent to acts of violence and excessive force occurring inside the county jail.

57.     Under *Monell*'s second element, the relevant policymaker for Defendant County is the Sheriff himself, Rick DeLeon (hereinafter, the "County Sheriff").[2]  He is the person who manages and administers the county jail. He is the policy maker. A policymaker is an individual who takes the place of the governing body in a designated area of municipal administration. *Zarnow v. City of Wichita Falls Tex.*, 614 F.3d 161, 167 (5th Cir., 2010) (finding the police chief to be a defendant Texas city's policymaker).  He or she decides the goals for a particular city function and devis[s] means of achieving those goals.  *See e.g., Cole v. Brazos County, Tex.* 981 F.2d 237, 245 (5th Cir. 1993).  Upon information and belief, the County Sheriff decides the goals and metrics for the law enforcement activities within the jail, and devises means of achieving those goals.  The mere existence of oversight over the County Sheriff by a Commissioners Court is not enough to negate the idea that the relevant policymaker in the county jail is the Sheriff himself. That is because continuous refusal to exercise some theoretical authority to review a municipal official's policy decisions will, at some point, establish a municipal official as the final policymaking authority by custom or usage having the force of state law.  Here, the Defendant County had notice through its officers' body camera videos, incident reports, Internal Affairs investigations, audits, criminal case dismissals, and the large number of incidents for such a

---

[2] Long time Sheriff Frank "Skipper" Osborne held the sheriff's post for 12 years, and retired from his position in January 2025. Sheriff Osborn was the policymaker during the time of the relevant facts in this case, in 2023.

smaller police force.  An additional reason for attribution to Defendant County through the County Sheriff is his highly publicized defense of his officers before an agreement by the County.

58.    Under *Monell's* third element, the deprivation that Plaintiff endured was to the custom.  Defendant County prior Internal Affairs Investigations into the officers that engaged in the above detailed custom was merely perfunctory.  Indeed, there had been prior internal affairs complaints against the same officers.  And as it pertains to this particular violent incident involving the Plaintiff, the Defendant County has apparently engaged in an internal affairs investigation concerning the deputies involved, citing the alleged existence of criminal investigations being conducted by the FBI and/or the Texas Rangers (even though no criminal charges have been brought by said agencies). Additionally, based on information and belief, there has been a pattern of complaints by other victims of violence and excessive force inside the county jail before Plaintiff was assaulted. Many of those incidents went without being investigated, thereby protecting the officers involved from any real consequences, as there are no documents in existence showing such investigations. This is a custom in Defendant County, to turn a blind-eye to violence in its jail and violations of law, given the lawlessness displayed by the prior Sheriff in office. In fact, the former Sheriff of Matagorda County, Frank "Skipper" Osborne, was arrested and charged with tampering with government records in 2020. According to the indictment against him, Sheriff Osborne allegedly removed the record of arrest of a woman from the Matagorda County Sheriff's Office jailing computerized database, and redacted her arrest from the master jail book. Based on information and belief, in 2021, he reached an agreed plea agreement and pled guilty to a lesser charge of attempted tampering with a government record. Thus, respectfully, Defendant County's custom was a moving force behind Plaintiff's injuries.

18

59.     A governmental entity may be directly liable under *Monell v. Dep't of Soc. Servs*., 436 U.S. 658 (1978).  For such, Plaintiff need only show (1) an official policy or custom, (2) that a policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose moving force is that policy or custom.  *Moore v. LaSalle Management*, No. 20-30739 (5ᵗʰ Cir., July 22, 2022 *reh'g denied*)at Pg. 21 ¶ 2; *Bishop v. Arcuri*, 674 F.3d 456, 467 (5ᵗʰ Cir. 2012, *reh'g denied*).

a.      **THE CUSTOM**

60.     At this very early stage in the litigation, a plaintiff need not state the specific policy, because the "plaintiff will generally not have access to it, but may be more general." *LaShan Arceneaux v. Klein Indep. Sch. Dist.*, 2018 U.S. Dist. LEXIS 85431 *19 (S.D. Tex. 2018) (Rosenthal, L.) (finding Monell claim survived a Fed. R. Civ. P. 12(b)(6) motion to dismiss).  It, after all, is exceedingly rare that a plaintiff will have access to (or personal knowledge of) specific details regarding the existence or absence of internal policies or procedures prior to discovery.[3]  It, therefore, would be wholly unreasonable to require a plaintiff at this stage in the litigation to allege with specificity all of the other acts by other officers that he will rely upon to demonstrate a policy. *Louzi v. Fort Bend Cty.*, 2020 U.S. Dist. LEXIS 154775 *14 (S.D. Tex. 2020).

61.     That said, there are at least three ways to establish an official policy under *Monell*: (1) written policy statements, ordinances, or regulations, (2) a widespread practice that is so common and well-settled as to constitute a custom that fairly represents policy, or (3) even a single decision may constitute municipal policy where the official or entity possessing final policymaking authority for an action performed the specific act that forms the basis of the § 1983 claim. *St.*

---

[3]  *See Ettinoffe v. Sheikh*, 2022 U.S. Dist. LEXIS 182151 *12 (S.D. Tex. 2022); *Samuel v. City of Houston*, 2023 U.S. Dist. LEXIS 175054 *38-39 (S.D. Tex. 2023); *Thomas v. City of Galveston*, 800 F. Supp. 2d 826, 842-843 (S.D. Tex. 2011).

*Maron Props., L.L.C. v. City of Houston*, 2023 U.S. App. LEXIS 22044 *7 (5ᵗʰ Cir. 2023).  Here, upon information and belief, Defendant Matagorda County has written policy statements, common and well-settled widespread practices, and/or single decisions by policymakers within the administration that results in constitutional rights violations that will be uncovered in discovery.

62.    For now, at least, Plaintiff is aware of two (2) of Defendant Matagorda County's relevant customs.  The first is a custom of using more force than is necessary, and the second is a custom of denying medical care to detained individuals with serious medical needs.  The former is a custom, like the one found plausible in *Heckford v. City of Pasadena*, 2021 U.S. Dist. LEXIS 114573 (S.D. 2021) of using more force than is necessary. *Id*., *13.  The later is similar to the denial of medical care custom in *Bond v. Nueces Cnty.*, 2022 U.S. App. LEXIS 27460 *23 (5ᵗʰ Cir. 2022).  In *Bond*, for example, the Fifth Circuit reasoned that "to dismiss a case without permitting [the plaintiff] the opportunity to seek records in the defendant's possession that reflect a more accurate picture is to hold [the plaintiff] to a standard too high at this stage of litigation when [a plaintiff] has pleaded numerous alleged incidents of inadequate medical case." *Id*., at *23

63.    Other than requiring more than just one incident by non-policymakers, neither the Fifth Circuit nor the Supreme Court has set a specific number of incidents that is required for a plausible claim of municipal liability.  *Ettinoffe v. Sheikh*, 2022 U.S. Dist. LEXIS 182151 *11 (S.D. Tex. 2022) (Ellison, K.).  At most, the Fifth Circuit has noted that the more flagrant or severe the excessive force, the fewer incidents are required.  *Bennett v. Slidell*, 728 F.2d 762, 768 (5ᵗʰ Cir.) (en banc).  With all of that in mind, not many incidents are needed to establish a custom for Defendant Matagorda County given the severity of this incident.  Moreover, Matagorda County is also not a major metropolis like, for example, the City of Fort Worth with a massive legion of officers.  As of 2020 census, Matagorda County had a meager population of approximately 37,000

residents, and upon information and belief, Matagorda County does not have very many sheriff's deputies or employees.  Hence, not many incidents are needed to show a custom. That said, upon information and belief, the following incidents are part of the pattern-or-practice inside the county jail administered and managed by the Defendant County:

a.     On September 9, 2019, pregnant inmate Kayla Wendel was viciously assaulted by Matagorda County's jailer Lyora Rion while a jailer Bryan Parrot and a Sergeant Sonjya Tumlinson watched and failed to intervene.  Therefore, they denied him medical care.

b.     On September 24, 2019, Matagorda County Officers Lyora Rion, Megan King, and Bryan Parrot stripped inmate Kayla Diane Wendel naked and unnecessarily twice threw her to ground hurting her back and against the wall.  After which, they sat her in a cell and as she screamed and cried for help, they then denied her medical care.

c.     On November 11, 2019, a Matagorda County Jailer May and a Lieutenant Adam Vela violently beat up inmate Casey Reiger without reason while Officer Weldon Thomas May watched and failed to intervene.  During the beating, inmate Casey Reiger started yelling that he needed a witness because they were beating him up and he was not resisting.  After this, the Lieutenant threatened the inmate to not say anything and they denied the inmate medical care for his serious injuries.

d.     On April 28, 2019, Matagorda County Officer Hall and Bryan Parrott abruptly and unnecessarily threw inmate Houston Doyal McKinney up against a hard wall and unnecessarily pushing her against it causing her face to bleed.  Although inmate McKinney was in obvious need of medical attention for the blood dripping down her face, the officers denied to provide it to her or to take her to receive medical attention for her injuries.

e.     On May 3, 2019, Matagorda County denied inmate Edwin Knowles Eufondo breakfast, and when the inmate complained Matagorda County Lieutenant Adam Vela abruptly and unnecessarily used an overwhelming amount of force upon the inmate.  After which, the inmate was taken to another cell where he had a seizure and was denied medical care.  Then, to punish the inmate, the jailers stripped him naked.

f.     On May 25, 2019, Matagorda County officers denied inmate Liana Marie White food, and when she complained Matagorda County Sergeant Sonjya Tumlinson and Officer Lyora Rion abruptly and suddenly applied unreasonable force upon her and caused her causing her injuries.  After which, they denied her medical care.

21

g.      On June 10, 2019, Matagorda County Officer Carrillo used unreasonable force on inmate Ryan Haywood Sauceda while he pleaded with the officer to take his hands off of him.  Despite the request, Matagorda County Officer Carrillo abruptly and suddenly without provocation took the inmate to ground causing him serious injuries.  After which, the inmate was denied medical care for his medical needs.

h.      On June 29, 2019, Matagorda County Sergeant John Garza abruptly and unreasonable threw inmate Domingo Carlos Martinez to the ground, and pressed him face down to the floor.  After which, the inmate was denied medical care for his serious medical needs.

i.      On July 7, 2019, Matagorda County Officer Rion Lyora abruptly and unreasonably removed inmate Jessica Ramirez from a vehicle that was parked in the sally port. Officer Bryan Parrott then used unreasonable military tactics to pick her up, and drag her insider the jail.  After which,  Officer Rion Lyora asked for Bryan Parrott's knife so that they could get the inmate's clothes off.  After which, she was naked and denied medical care for her serious medical needs.

j.      On July 22, 2019, Matagorda County Officer Bryan Parrott abruptly and suddenly removed inmate Dwayne Alberto Furet from a vehicle parked in the sally port by his right arm using military style tactics.  Upon arriving at the cell, the inmate continued to passively resist at most.  At that time, Matagorda County Officer Bryan Parrot delivered an unreasonable strike to the inmate's left hamstring violently and unreasonably bringing him to the floor.  After which, the inmate was stripped naked and denied medical care for his serious medical needs.

k.      On July 24, 2019, Matagorda County Officer Bryan Parrot abruptly and suddenly violently grabbed inmate James Hicks in the sally port, and pushed him against the wall causing him injury.  Then, they dragged him inside the jail without care having him hit his foot on the gate.  At the cell, Matagorda County Officer Bryan Parrot began to beat the inmate up, specifically delivering three (3) strikes with his right knee to the inmate's right hamstring.  After which, they stripped the inmate naked and he was denied medical care.

l.      On July 25, 2019, Matagorda County Officer Lyora Rion, Bryan Parrott, and Hohnson all noticed that inmate Rion Lyora had several recent and fresh cuts on her wrists.  But instead of providing her with medical care for her serious medical needs, the officers instead placed her in a cell. There, they used unreasonable force to strip her naked.

m.      On September 21, 2019, inmate Devin Gene Mcnett advised Matagorda County Officer Joel Wamger that he needed his meds, but was denied his meds.  Instead, Matagorda County Officer Joel Wamger and Officer Leverett used unreasonable force on the inmate, and denied him medical care thereafter for his serious medical needs.

22

n.  On December 7, 2019, inmate Kendrick White advised Matagorda County Officer Lyora Rion that he seriously needed use the restroom.  Such, however, was not allowed, and the inmate was made to urinate himself.  Thereafter, the officers unreasonably threw him up against a wall and to the ground and began to strip him naked while holding him face down.  After which, the inmate was denied medical care for his serious medical injuries.

o.  On December 25, 2019, Matagorda County Sergeant Eastman and Officers May, Torrez and Ratliff used unreasonable force on inmate Antonio James Galavan who was injured, and then thereafter denied medical care for his serious medical injuries.

p.  On December 26, 2019, Officer Lyora Rion and Officer King abruptly and suddenly removed inmate Marilyn Alvarado Trevino from a vehicle that was parked in the sally port.  After which, the inmate was dragged into the jail where they tried to smash her head into the gate.  After which, she coughed up and spit some blood, and then was denied medical care for her serious injuries.

q.  On February 11, 2020, Matagorda County Officers Parrott and Rion used unreasonable force to bring inmate Hector Zamora in from the sally port, and the inmate's head was banged on the wall.  Then, Officer Bryan Parrott slapped inmate Zamora on the side of the head.  After which, the officers escorted the inmate elsewhere and closed the door.  After opening the holding cell door, Matagorda County Officer Parrot abruptly and suddenly grabbed the inmate's jumper and drove him up against the wall.  Parrot again then grabbed the inmate by the jumper, threw up and he went flying out of the holding cell.  After which, he was dragged backwards back into the cell.  Thereafter, they denied him medical care for his serious medical needs.

r.  On March 19, 2020, inmate Sharon Brennte passively declined to sign some paperwork.  After which, Matagorda County Sergeant Tumilson  abruptly and suddenly grabbed her and pushed her up against the all, using more force than was necessary.  After which, the inmate was injured and denial medical care for her serious medical injuries.

s.  On May 10, 2020, Matagorda County Jailer Lyora Rion repeatedly suggested to Sergeant Sonjya Tumilson that they roll or beat up inmate Jason Barton Starr. Then, Matagorda County Jailer Bryan Parrot joined in and started making the same requests, and the Sergeant relented. After which, they told inmate Starr to exit his cell, and inmate Starr complied.  Then, abruptly and without provocation,  jailers violently threw him up against the wall and viciously beat him as authorized by the supervisor.  During the beating they also threw him face down onto a table.  After which, jailers denied inmate Jason Barton medical care for his serious injuries.

t.  Sometime later that same day or another day, inmate Jason Barton made a joke to a trustee that was mopping the floor.  Bryan Parrot then grew tired of Jason Barton's "Mickey Mouse" jokes, and threatened to violently "pack" inmate Jason Barton.

23

Then, Jailers Bryan Parrott and Jacob Garcia again viciously beat inmate Jason Barton. After which, the jailers again denied him medical care for his serious injuries.

u.      On April 21, 2020, Matagorda County jailer Bryan Parrot without reason violently kicked inmate Michael Mugler's knee from out of under him, and proceeded to unnecessarily drag the inmate.

v.      On June 12, 2020, inmate X-Zanterell Brash-Jon had a seizure while in the custody of Matagorda County. While this occurred, Matagorda County Officer Bryan Parrott went to go get Officer Gonzales so that she could watch. During which time, they beat him up and denied him medical care.

w.      On January 1, 2021, Matagorda County Sherrif Sergeant John Garza abruptly and violently dragged transported inmate Leah Jeaneice Wiley from a patrol car, dragged her to a cell, and stripped her naked. Injured, she was in need of medical attention, but such was not provided.

x.      On January 1, 2021, Matagorda County Officer Weldon Thomas May removed inmate Lillyana Stillwell from her cell to get fingerprinted. There, Matagorda County Sergeant Eastman abruptly and violently grabbed her arm and beat her. She was then dragged to her where she was denied medical care for her injuries.

y.      On February 9, 2021, Matagorda County Officer Raymond Gonzalez asked inmate Carl Whipple Thomas some questions, and the inmate passively resisted and indicated that he was going to sue Matagorda County for what they had done to him. After which, upon information and belief Officer Raymond Gonzalez and Sergeant Vela used unreasonable force upon him and denied him medical care for his serious medical needs.

z.      On February 21, 2021, Matagorda County Sergeant John Garza, Officer Jimmenez, and Lyora Rion proceeded to a parked vehicle in the sally port. Upon information and belief, they abruptly and violently dragged inmate Dominique Kayvon Rice from the vehicle and violently threw him up against the wall. During which time, the inmate advised the police that what they were doing was illegal. Then, they slammed the inmate to the ground and got on top of him and applied unreasonable force of the subdued inmate. After which, they stripped him naked and denied him medical care for his serious medical needs.

aa.     On April 3, 2021, Matagorda County Officer Robert Garcia and Sergeant John Garza encountered an injured inmate Darren Eugene Lentz, and moved him to another cell instead of providing him medical care for his serious medical needs. During which time, they used unreasonable force on the inmate to do so.

24

bb.     On July 26, 2021, Matagorda County Officer Steve Gonzalez and Officer Jimenez used unreasonable force upon inmate Michael Mark Allen, and thereafter denied him medical care for his serious medical needs.

cc.     On August 2, 2021, Matagorda County Sergeant John Garza and Officer Garcia entered inmate Noel Resto's cell where the inmate passively resisted at most, and Sergeant Garza and Garcia met that with an abrupt and unmeasured level of overwhelming and unnecessary force.  Thereafter, to further humiliate the inmate, they stripped him naked and denied him medical care for his serious medical needs.

dd.     On September 9, 2021, inmate Henri Ward has a seizure while in the custody of Matagorda County, and its officers denied her medical for her serious medical needs.  Instead of helping her, Matagorda County Sergeant John Garza and Officer Maria Perez dragged her to another room and used unreasonable force upon her, and then denied her medical care for her serious medical needs.

ee.     On October 31, 2021, inmate James Edward Sims was passively sitting in the back seat of a patrol car when Matagorda County Sergeant Villarreal Ishmael suddenly and abruptly dragged him out of the vehicle causing the inmate serious injuries.  After which, Matagorda County denied inmate James Edward Sims medical care for his serious medical needs.

ff.     On December 29, 2021, Matagorda County Officer Cox violently and unnecessarily threw inmate Reuben Emilio Solis against the wall.  After which, Matagorda County stripped the inmate of his clothes and denied him medical care.

gg.     On February 1, 2022, Matagorda County Officers Howard Lee Cox and Jacob Garcia thought it would be funny to deprive inmate Noah Abraham Rodriguez of a cookie that had been given to all of the other inmates for dinner.  Understanding upset, inmate Noah Abraham Rodriguez commented on the unfairness.  After which, Matagorda County Officers Howard Lee Cox and Jacob Garcia and Sergeant John Garza and viciously beat inmate Noah Abraham Rodriguez, dragged him out of the cell, and tied him to a restraint chair instead of providing him with the medical care that he needed for his serious injuries.  During this, Biskup watched, could have intervened but did not do so.

hh.     On September 30, 2022, Matagorda County Officer Ishmael Villarreal and Robert Garcia viciously beat inmate Julian Christopher Garcia.  They took him to the ground where they beat him further.  Then, they dragged him to another.  After which, they denied him medical care despite his plead requesting for such care.

ii.     On February 1, 2023, Matagorda County Officers Gonzalez, May, and Montalvo abruptly and unreasonable dragged inmate Nicholas Llyod Henderson from a vehicle parked in the sally port.  After which, he was stripped naked and then denied medical care.

25

jj.   On March 18, 2023, Matagorda County Sheriff Officer Danielle Biskup abruptly and violently threw inmate Stacie Lianee Consancio to her stomach after she was passively resisting at most.   After which, they denied her medical care for her serious medical injuries.

We now turn to the issue of who is the policymaker under the *Monell* doctrine.

### b. THE POLICYMAKER

64.   Under Monell's second element, Plaintiff need only show that a policymaker actually or constructively knew of the custom. *Moore v. LaSalle Management*, No. 20-30739 (5th Cir. July 22, 2022) at Pg. 23 ¶ 1.  A policymaker is an individual or individuals who takes the place of the governing body in a designated area of government administration.  *Zarnow v. City of Wichita Falls Tex.*, 614 F.3d (5th Cir. 2010).  Here, that would be either the Defendant's Sherriff or its Commissioner's Court.  Upon the former, the Harris County Sheriff is the policymaker for the Defendant with regards to both the Harris County Jail and the employees of the Sheriff's Office.  *Bartee v. Harris Cty*., 2018 U.S. Dist. LEXIS 232945 *9 (S.D. Tex. 2018).  As background, in Texas, sheriffs "have indisputable wide-ranging discretion in the selection of their employees." *Garcia v. Reeves County*, 32 F.3d 200, 203 (5th Cir. 1994).  Among which, a sheriff may, with the approval of the Commissioners Court employ a sufficient number of guards to ensure the security of a jail. *See* Tex. Gov't Code § 85.005.  Moreover, deputies serve at the pleasure of the sheriff.  *See* Tex. Gov't Code § 85.003(c). Thus, either or both the Sheriff and/or the Commissioner's Court are the relevant policymakers for the purposes of Monell's second element. And, here, these policymakers would have had notice of the custom through the above pled pattern of incidents.

65.   In this case, it is clear that the policy maker was the County Sheriff who was responsible for administering and managing the county jail and establish the rules and policies inside the jail, who also appointed the deputies to aid him in managing the jail and implementing

his policies, and who directly and indirectly supervised all deputies and staff inside the jail in Matagorda County.

## COUNT 5 - FAILURE TO TRAIN
### (Against Defendant County)

66.     To show a failure-to-train, Plaintiff need only show that (1) the police chief failed to train the officer, (2) a causal connection existed between the failure to train and the violation of the plaintiff's rights, and (3) the failure to train amounted to deliberate indifference to the plaintiff's constitutional rights. *Hobart v. Estrada*, 582 F. App'x 348, 356 (5th Cir. 2014).  Such can also be shown through "a pattern of similar violations."  *Id*.

67.     Here, first, the Defendant County failed to train the deputies involved in the violation of Plaintiff's constitutional rights. Defendants Caleb Robles, Bryan Resendez, Lee Longoria, Jerry Johnson, John Garza and Danielle Galavan did not receive any training whatsoever, or alternatively, the training that she did receive was deficient. In particular, those Defendants were not properly trained as to what was required for non-violent jail bookings and to properly medical supervise or monitor a jailed detainee, or tend to severely injured detainees such as Romano, or even how to properly deescalate conflict during routine jail activity, including jail bookings, and other key areas required for performance of their job as a police officers.  Second, there is a causal connection between that failure to train and the violation of Plaintiff's constitutional rights.  Third, that failure to train amounted to deliberate indifference to the Plaintiff's constitutional rights.

68.     More precisely, there was a pattern of incidents for at least 4 years prior (and possible more years before that, based on information and belief) and until the date of the incident at issue in this lawsuit.  Since at least 2019 Defendant County and/or the County Sheriff knew that

the named Defendant officers routinely acted violently and abused of detainees inside the so-called padded rooms, as well as other jailed inmates in their cells, but allowed them to continue doing so. Moreover, the Defendant County also knew that the named Defendant officers were not a credible as they would, based on information and belief, routinely omit key details and provided false testimony, or outright omitted, deleted or altered records. Given so, this deliberate indifference was a moving force in the constitutional violations suffered by the Plaintiff.

## COUNT 6 - FAILURE TO SUPERVISE
### (Against Defendant County)

69.     To show a failure-to-supervise, Plaintiff need only show that (1) "the police chief failed to supervise," (2) "a causal connection between the failure to supervise and the violation of the plaintiff's rights," and (3) "such failure to supervise… amounted to gross negligence or deliberate indifference." _Doe v. Taylor Independent School Dist._, 15 F.3d 443, 452 (5th Cir. 1994)., 443.  To that end, the Fifth Circuit has never required that a supervisory official be warned of the precise act that the subordinate official subsequently commits, rather, all that the Fifth Circuit (and the Supreme Court) requires is that supervisory officials just be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists.  _Smith v. Brenoettsy_, 158 F.3d 908, 912 (5th Cir. 1998).  Here, the fact that there have been complaints in the news, prior internal affairs investigations, audits, incident reports, conversations between officers, and other related documents, a reasonable jury could find that Defendant County and other supervisory officials were on notice of a pattern of incidents involving the named Defendant officers.

70.     Liability of the municipality here depends upon whether Defendant County, through the County Sheriff, had sufficient notice— that the failure to supervise the Defendants was likely to lead to a violation of the Fourth Amendment rights of those citizens that they would encounter. _Compare Brown v. Bryan County_, 219 F.3d 459, 460 (5th Cir. 2000). To which, two

things may be of importance. The first is whether it should have been obvious to the County Sheriff that the highly predictable consequence of not supervising Defendants Caleb Robles, Bryan Resendez, Lee Longoria, Jerry Johnson, John Garza and Danielle Galavan would lead to such brutal assaults as the one committed by Defendants Resendez and Robles against the Plaintiff; and the second is that this failure to supervise was a "moving force" with a causal connection to the constitutional injury. _Brown_, 462 (5th Cir. 2000).  Here, considering the above and the pattern it was a highly predictable consequence, and such was a moving force behind the Plaintiff's injuries.

a.  **NO QUALIFIED IMMUNITY**

71.     To shield themselves from liability, it is reasonable to assume that the individual officers joined to this lawsuit (but not the municipality), will defend themselves raising the doctrine of "qualified immunity," meaning they will assert that their actions as law enforcement agents in the process of detaining, arresting, booking and jailing the Plaintiff, were reasonable and justified under the circumstances.

72.     The defense of qualified immunity protects all but the plainly incompetent, and those who knowingly violate the law. _Hughes v. Garcia_, 2024 U.S. App. LEXIS 10922 *13 (5th Cir. 2024) (denying qualified immunity). It will not protect officers who apply excessive and unreasonable force merely because their ways of applying it are novel. _Frank v. Parnell_, 2023 U.S. App. LEXIS 23893 *18 (5th Cir. 2023) (finding the same).

73.     Rather, government officials are entitled to qualified immunity **_only if_** (1) the officer violated a federal statutory or constitutional right and (2) the unlawfulness of the conduct was clearly established at the time. _Hughes v. Garcia_, 2024 U.S. App. LEXIS 10922 *13 (5th Cir. 2024) (denying qualified immunity).   The test for it involves two steps which ask: (a) whether a federal or constitutional right was violated, and (b) whether the right in question was clearly

established at the time of the alleged violation.  First, an officer may violate a plaintiff's Fourth Amendment rights by failing to intervene.  *Joseph v. Bartlett*, 981 F.3d 319, 345 (5th Cir. 2020). Second, it has long been clearly established that a supervisory officer may be liable under § 1983 if he or she refuses to intervene where his or her subordinates are beating an inmate in his or her presence.  *Harris v. Chanclor*, 537 F.2d 203, 206 (5th Cir. 1976) (stating the same).  Moreover, it was also clearly established that an officer may not stand by, laugh, and acquiesce while another officer uses excessive force upon a citizen.  *Hale v. Townley*, 45 F.3d 914, 918 (5th Cir. 1995) (finding the same).

74.    Upon the first, a pretrial detainee, like the Plaintiff, receives the protections of Due Process Clause of the Fourteenth Amendment.  *Austin v. City of Pasadena*, 74 F.4th 312, 322 (5th Cir. 2023) (observing the same).  Moreover, the Fourth Amendment enshrines the right to be free from excessive force.  *Castro v. Kory*, 2024 U.S. App. LEXIS 8805 *11-12 (5th Cir. 2024) (denying qualified immunity on excessive force).  Force against a pretrial detainee is excessive and a violation of the Fourteenth Amendment when the force was objectively unreasonable. Austin v. City of Pasadena, 74 F.4th 312, 322 (5th Cir. 2023) (observing the same).

75.    As to the second, the Fifth Circuit has repeatedly stated that its precedents can clearly establish the law.  *Walls v. Sheriff's Off. of Caddo Par.*, 2023 U.S. App. LEXIS 32241 *4 (5th Cir. 2023) (observing the same); *Boyd v. McNamara*, 74 F.4th 662, 670-71 (5th Cir. 2023) (same).  From those precedents, a plaintiff may demonstrate clearly established law by identifying a case or body of relevant case law in which the violation of the Constitution was found under factually similar circumstances.  *Lewis v. Inocencio*, 2024 U.S. App. LEXIS 1416 *10 (5th Cir. 2024) (finding excessive force claim survives).

76.     Among those cases, an officer may not use force on an individual who is complying with his or her commands. *Bagley v. Guillen*, 90 F.4th 799, 803 (5th Cir. 2024) (affirming denial of qualified immunity).  Nor may an officer abruptly resort to overwhelming physical force rather than continuing verbal negotiations with an individual who poses no immediate threat or flight risk, who engages in, at most passive resistance. *Boyd v. McNamara*, 74 F.4th 662, 668 (5th Cir. 2023); *Hanks v. Rogers*, 853 F.3d 738, 747 (5th Cir. 2017).

77.     On top of that, in the jail context as in others, it is well-established that officers may not use gratuitous force against a prisoner who has already been subdued or incapacitated. *Cowart v. Erwin*, 837 F.3d 444, 554 (5th Cir. 2016) (affirming excessive force jury verdict).  Moreover, jailers may not continue to apply force more than two minutes after the plaintiff was subdued. *Fairchild v. Coryell Cnty.*, 40 F.4th 359, 361 (5th Cir. 2022) (reserving summary judgment on excessive force claim).

78.     After an inmate submits, there is no need, and no justification, for the further use of force. *Aucoin v. Cupil*, 958 F.3d 379, 380 (5th Cir. 2023) (reserving dismissal of excessive force claim).  Given so, a constitutional violation occurs when an officer strikes or violently slams a subject who is not actively resisting. *Darden v. City of Fort Worth*, 880 F.3d 722, 731 (5th Cir. 2018).

79.     Meaning that, once a suspect is subdued and no longer resisting an officer's subsequent use of force is excessive. *Bagley v. Guillen*, 90 F.4th 799, 803 (5th Cir. 2024) (affirming denial of qualified immunity); *Carroll v. Ellington*, 800 F.3d 154, 177 (5th Cir. 2015).

31

80.    Additionally, violent force is a plainly excessive response to disrespectful behavior and other passive resistance. *Larpenter v. Vera*, 2023 U.S. App. LEXIS 22770 *17 (5th Cir. 2023). Therefore, if any of the Defendants allege that Plaintiff was drunk, belligerent or verbally disrespectful, that would not be a justification to assault him or use excessive force.

81.    Furthermore, those officers who did not physically assault or beat Plaintiff but did not intervene to stop it either, cannot raise qualified immunity as a defense. A failure to intervene claim arises when an officer, who can prevent harm caused by a fellow officer's constitutional violations, fails to act. *Castro v. Kory*, 2024 U.S. App. LEXIS 8805 *13 (5th Cir. 2024) (finding failure to intervene claim survives); *Kitchen v. Dallas County*, 759 F.3d 468 (5th Cir. 2014).  An officer who is present at the scene and does not take reasonable measures to protect a citizen from another officer's use of force may be liable under § 1983. *Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995).  The elements include an officer (1) knew a fellow officer was violating an individual's constitutional rights, (2) was present at the scene of the constitutional violation, (3) had a reasonable opportunity to prevent the harm but nevertheless, (4) chose not to act. *Austin v. City of Pasadena*, 74 F.4th 312, 331 (5th Cir. 2023); *Joseph v. Bartlett*, 981 F.3d 319, 343 (5th Cir. 2020).

82.    Here, first, Defendants Caleb Robles, Bryan Resendez, Rene Padilla and Lee Longoria all knew that each other was violating the Plaintiff's constitutional rights.  Second and third, each of them were present at the scene and had a reasonable opportunity to prevent the harm considering how long the beating lasted.  Fourth, but they chose not to act and instead encouraged each other to continue the vicious beating of the Plaintiff wile laughing. Qualified immunity cannot save them because they failed to intervene.

32

## VI.    DAMAGES

83.    Defendants are jointly and severally liable for the wrongs complained of, either by virtue of direct participation or by virtue of ordering, encouraging, aiding, abetting, committing, and/or ratifying and condoning the commission of the above-described acts and/or omissions.

84.    Plaintiff suffered compensatory, special, and punitive damages for the following:

a.    Physical impairment;

b.    Physical disfigurement;

c.    Extreme mental anguish and emotional distress;

d.    Lost wages and loss of earnings capacity;

e.    Loss of enjoyment of life;

f.    Pain and suffering;

g.    Violations of his constitutional rights by Defendants; and

h.    Reasonable and necessary attorneys' fees incurred.

## VII.    PUNITIVE DAMAGES

85.    Punitive damages may be awarded in § 1983 cases against the individual officers (but not the municipality) if the facts show and establish an egregiously harmful intent, callousness or recklessness.  Said punitive damages are recoverable for the egregious acts and omissions of Defendants Caleb Robles, Bryan Resendez, Lee Longoria, Jerry Johnson, John Garza and Danielle Galavan.  To the extent this request conflicts with *Newport v. Fact Concerts*, 453 U.S. 247, 101 S. Ct. 2748 (1981), Plaintiff disclaims those requests.

## VIII.    JURY DEMAND

86.    Plaintiff respectfully demands that this action be heard before a jury.

## IX.     PRAYER

87.     For all the foregoing reasons, Plaintiff Daniel Romano prays for judgment against all Defendants jointly, severally and in solidarity, as follows:

a.     compensatory, special and punitive damages;

b.     the cost of this action and reasonable attorneys' fees as provided by 42 U.S.C. §1988;

c.     pre-judgment and post-judgment interest;

d.     trial by jury; and

e.     such other and further relief, at law and in equity, that the Honorable Court deems just and equitable.

Respectfully submitted,

THE SHARIFF LAW FIRM

By: _____
M. Obaid Shariff
Federal I.D. No. 2827312
Texas Bar No. 24091135
mshariff@sharifflawfirm.com
Kevin Acevedo
Federal .ID. No. 2932922
Texas Bar No. 24086848
kacevedo@sharifflawfirm.com
Kenley J. Rowe
Federal I.D. No.  3892106
Texas Bar No. 24131633
krowe@sharifflawfirm.com
2500 West Loop South, Suite 300
Houston, Texas 77027
(713) 244-8392 (Telephone)
(713) 244-8372 (Fax)
ELECTRONIC SERVICE VIA:
eservice@sharifflawfirm.com

ATTORNEYS FOR PLAINTIFF
DANIEL ROMANO